Nathan M. Olsen, ISB No. 7373
Adam N. Olsen, ISB No. 11594
**OLSEN TAGGART PLLC**
P. O. Box 3005
Idaho Falls, ID 83403
Telephone: (208) 523-4650
Telephone: (208) 552-6442
Facsimile: (208) 524-6095
Email: nolsen@olsentaggart.com
        aolsen@olsentaggart.com

Attorneys for Plaintiff

# UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| VAL PALMER, an individual; and COLEEN PALMER, and individual, <br><br> Plaintiffs, <br><br> vs. <br><br> PAUL A. CARRANZA, an individual; ANDREW HEITZMAN, an individual; ADAM MATTHEWS, an individual; MATTHEW RAPATTONI, an individual; and KYLIE WHITE, an individual, <br><br> Defendants. | Case No._____ <br><br><br> **COMPLAINT AND DEMAND FOR JURY TRIAL** |

COMES NOW, Plaintiffs VAL PALMER, an individual ("Mr. Palmer" or "Plaintiff"), and

COLEEN PALMER, an individual ("Mrs. Palmer" or "Plaintiff"), by and through counsel, Nathan

M. Olsen and Adam N. Olsen of Olsen Taggart PLLC, and complains against PAUL A.

CARRANZA, an individual ("Officer Carranza"), ANDREW HEITZMAN, an individual

("Detective Heitzman"), ADAM MATTHEWS, an individual ("Officer Matthews"), MATTHEW

RAPATTONI, an individual ("Officer Rappattoni"), and KYLIE WHITE, an individual ("Officer White"), (hereafter collectively referred to as "Defendants") as follows:

**PARTIES**

1.      Plaintiff Mr. Palmer is an individual who is a resident of Canyon County, Idaho.

2.      Plaintiff Mrs. Palmer is an individual who is a resident of Canyon County, Idaho.

3.      Defendant Officer Carranza is, at all times relevant, a police officer employed by the City of Caldwell.

4.      Defendant Detective Heitzman is, at all times relevant, a police officer employed by the City of Caldwell.

5.      Defendant Officer Matthews is, at all times relevant, a police officer employed by the City of Caldwell.

6.      Defendant Officer Rapattoni is, at all times relevant, a police officer employed by the City of Caldwell.

7.      Defendant Officer White is, at all times relevant, a police officer employed by the City of Caldwell.

**JURISDICTION AND VENUE**

8.      This action arises under 42 U.S.C. § 1983; jurisdiction is therefore proper under 28 USC § 1331.

9.      This Court has personal jurisdiction over the parties in this matter under FRCP 4(k)(1)(A) as all Parties reside in Idaho.

10.     Venue in this judicial district is proper under 28 U.S.C. § 1391(b) as all the Defendants reside in Idaho and the substantial part of the acts giving rise to Plaintiffs' claims occurred in Idaho.

**COMPLAINT AND DEMAND FOR JURY TRIAL - 2**

## GENERAL ALLEGATIONS

11.     Mr. Palmer is a chiropractor. His business is dependent on having a good reputation.

12.     On September 13, 2021, at around 8:45 a.m., Mr. Palmer left his home to make a routine trip to a fitness gym prior to starting the workday.

13.     As Mr. Palmer was traveling west on the Franklin Street bridge over I-84 near Caldwell ("Franklin Overpass"), his 2008 Toyota Prius ran out of gas.

14.     Mr. Palmer pulled the vehicle over to the shoulder of the Franklin Overpass.

15.     Mr. Palmer then called his wife, Coleen Palmer (Mrs. Palmer), and informed her of his situation and asked her to bring him a filled gas canister.

16.     Mrs. Palmer immediately grabbed the gas canister and began traveling to the Franklin Overpass with her father.

17.     While Mr. Palmer was on the phone with Mrs. Palmer, one of the Palmer's neighbors was driving west over the Franklin Overpass when the neighbor saw Mr. Palmer in his car on the shoulder of the road.

18.     Concerned, the neighbor called Mr. Palmer and left a voicemail asking if Mr. Palmer was okay.

19.     After finishing his call with Mrs. Palmer, Mr. Palmer retrieved the voicemail and called the neighbor back and left a voicemail—calmly informing the neighbor that his car ran out of gas and that Mrs. Palmer was in route with gas.

20.     Shortly after the call, traffic on the Franklin Overpass increased and Mr. Palmer exited the car and waited on the sidewalk for his wife to arrive.

**COMPLAINT AND DEMAND FOR JURY TRIAL - 3**

21.     Parallel to the sidewalk and overlooking I-84 is an approximately three-foot high concrete barrier upon which sits a six-foot high wrought iron fence.

22.     While waiting for his wife to bring him gas, Mr. Palmer stretched his arms and legs against the fence and barrier.

23.     While Mr. Palmer was stretching, Detective Heitzman was driving his unmarked police vehicle and observed Mr. Palmer from afar stretching.

24.     Detective Heitzman immediately pulled his vehicle behind Mr. Palmer's car and switched on his emergency lights.

25.     Surprised by this activity, Mr. Palmer moved away from the sidewalk and towards his car.

26.      As he did so, Detective Heitzman ordered Mr. Palmer to sit on the curb and not run away.  Mr. Palmer complied.

27.     Detective Heitzman then informed Mr. Palmer that he thought Mr. Palmer was attempting to climb the fence in order to commit suicide.

28.     Around the same time, Detective Heitzman called for backup.

29.     Mr. Palmer adamantly denied that he was attempting to the climb the fence and explained to Detective Heitzman that his car had ran out of gas while he was heading to the gym and that he was stretching while he waited for Mrs. Palmer to bring him gas.

30.     Mr. Palmer then sat up from the curb and went to the concrete barrier to demonstrate to Detective Heitzman the leg stretch he was doing.

31.     While Mr. Palmer was demonstrating the leg stretch, Detective Heitzman ordered Mr. Palmer to sit.

**COMPLAINT AND DEMAND FOR JURY TRIAL - 4**

32.     Mr. Palmer again complied and expressed that he was merely waiting for his wife to bring him gas.

33.     Mr. Palmer then expressed to Detective Heitzman that he was frustrated with being ordered to sit down to which Detective Heitzman responded by stating: "I don't know what you're doing, you're getting irate, you're yelling at me . . ." To which Mr. Palmer responded by stating that he has had bad experiences with police officers.

34.     During this exchange, Detective Heitzman was standing a few feet away from Mr. Palmer with his hands on his vest.

35.     As Mr. Palmer informed Detective Heitzman that he was "alright," Mr. Palmer received a phone call from Mrs. Palmer.

36.     When Mr. Palmer put his hands into his blue workout vest to retrieve his phone, Detective Heitzman ordered Mr. Palmer to keep his hands out of his pockets.  Mr. Palmer complied but with the phone in his hand.

37.     Frustrated with being ordered to sit on the curb and to not put his hands into his pocket while Detective Heitzman stood menacingly over him, Mr. Palmer asked for permission to answer the phone, which Detective Heitzman granted, to which Mr. Palmer yells: "It's a free country still, it's still a free country, right?"

38.     During Mr. Palmer's conversation with his wife, Mr. Palmer was calm and collected.

39.     Mr. Palmer urged his wife to hurry up and informed her that that a cop was ordering him to "sit down and be quiet."

40.     Mr. Palmer also insinuated during the phone call that the police were there to harass him and write him a ticket in order to pay for their salaries.

**COMPLAINT AND DEMAND FOR JURY TRIAL - 5**

41.     As Mr. Palmer was calmly speaking with his wife, a second officer with the Caldwell Police, Officer Carranza, approached Mr. Palmer and stood a few feet away from Mr. Palmer who was still sitting on the curb.

42.     Detective Heitzman turned to Officer Carranza and stated that Mr. Palmer was being "super irate."

43.     Detective Heitzman then returned to his unmarked police car "to run" Mr. Palmer.

44.     As Detective Heitzman was opening his door to his unmarked police car, he told Officer White, another Caldwell Police Officer called to the scene, that, "He's [Mr. Palmer] getting irate and starting to scream at me and shit."

45.     After being told this, Officer White positioned herself a few feet from Officer Carranza's left, thereby surrounding Mr. Palmer so as to give the impression that he was not free to leave.

46.     While Detective Heitzman was in his unmarked police car, Mr. Palmer calmly informed Officer Carranza that he ran out of gas and was waiting for his wife.

47.     At that same time, Mrs. Palmer and her father arrived with the gas canister at the end of the overpass. Mr. Palmer pointed to his wife with the gas canister and Officer Carranza looked over his shoulder and saw that Mrs. Palmer and her father was approaching the scene with the gas canister.

48.     Officer Carranza then asked Mr. Palmer why he "was attempting to climb the fence."

49.     Mr. Palmer again stated that he had ran out of gas while headed to the gym and was merely stretching.  Mr. Palmer also pointed out to the officers the clothing he (Mr. Palmer) was

wearing, which consisted of a gym shirt, gym shorts, tennis shoes, and a cut-off puffer vest. There was no acknowledgment or further inquiry from the officers.

50.     Mr. Palmer then stood up from the curb, pointed toward his wife and father-in-law and asked to be let go so that he could grab the gas canister from his wife.

51.     Mr. Carranza sternly ordered Mr. Palmer to "Sit down!"

52.     Before Mr. Palmer had an opportunity to sit back down, Officer Carranza positioned himself in front of Mr. Palmer and placed his hand on Mr. Palmer's chest. Mr. Palmer backed away stating, "Don't touch me, please, don't touch me," and proceeded to sit back down.

53.     Officer Carranza grabbed Mr. Palmer's left arm and shoulder and ordered Mr. Palmer to put his hands behind his back. Mr. Palmer refused.

54.     Officer Carranza then jumped on Mr. Palmer's back, jammed a knee into his back, and placed a forearm upon the back of Mr. Palmer's neck— forcefully trying to push Mr. Palmer face forward onto the ground.

55.     Shocked by the Officer Carranza's aggressive maneuver after obeying Officer Carranza's order to sit, Mr. Palmer balanced himself by placing both hands on the ground in order to avoid a faceplant into the concrete.

56.     Nevertheless, after a few seconds—and once Mr. Palmer was able to comprehend that he was being accosted for no reason—Mr. Palmer gave up his hands without any resistance.

57.     Officer Carranza then fastened the handcuffs so tightly around Mr. Palmer's wrist that the handcuffs cut into Mr. Palmer's wrist causing Mr. Palmer pain.

58.     While on the ground, Mr. Palmer again reiterated that he was not trying to climb the fence but was merely stretching while waiting for his wife to arrive with gas. At that moment,

under best information currently available and belief, Officer White ordered Mr. Palmer to "stop talking" to which Palmer emphatically responded that he (Mr. Palmer), still has a first amendment right.

59.     Mrs. Palmer and her father observed Mr. Palmer being accosted by the officers who had arrived at the scene.  Mrs. Palmer and her father protested what was occurring and insisted to the officers that Mr. Palmer was just "fine" and simply "ran out of gas."

60.     Detective Heitzman stepped in front of Mrs. Palmer and turned her the other direction and began explaining his version of events to her, which were inconsistent with the facts. For instance, he told Mrs. Palmer that Mr. Palmer was "attempting to climb the fence" when he clearly was not, and that Mr. Palmer was arguing and "not complying" with police officer demands.

61.     During the conversation Mrs. Palmer stated that the treatment of Mr. Palmer was unnecessary and that "Somebody has an ego problem."

62.     Detective Heitzman made no inquiry from Mrs. Palmer to confirm or corroborate her reason for being there.

63.     As Detective Heitzman and Mrs. Palmer were engaged in this exchange, the other officers paraded Mr. Palmer past them in handcuffs to Officer Carranza's marked police vehicle. When Officer Carranza was preparing to place Mr. Palmer in his police vehicle, he admitted to Mr. Palmer that he had tightly fastened the handcuffs to Mr. Palmer's wrist. Officer Carranza then loosened the handcuffs.

64.     Despite being handcuffed and placed inside a police car, Detective Heitzman informed Mrs. Palmer that Mr. Palmer was "not under arrest right now, we are trying to figure out what's going on."

**COMPLAINT AND DEMAND FOR JURY TRIAL - 8**

65.     Detective Heitzman subsequently demanded that Mrs. Palmer go to her car and "take a deep breath."  Mrs. Palmer refused and stated that she was "going to help her dad put gas in the car."

66.     As Mrs. Palmer walked away, she turned to Detective Heitzman and stated, "You guys are bored, obviously."

67.     At this point Detective Heitzman's voice became agitated and angry, and he screamed at Mrs. Palmer, "I'm not bored, that's the thing, I'm here trying to protect our community, so don't sit here telling me I'm bored."

68.     Detective Heitzman continued screaming at Mrs. Palmer, then waved her off, telling her to "go fill up the gas can, I'm done!"  As Detective Heitzman turned away, he called Mrs. Palmer a "fucking dumb bitch."

69.     After speaking with Mrs. Palmer, Detective Heitzman began talking with Mr. Palmer, who was handcuffed in the back of Officer Carranza's police car.

70.     Again, Detective Heitzman asked what Mr. Palmer was doing on the sidewalk and Mr. Palmer again told Detective Heitzman that he was waiting for gas and stretching.

71.     Detective Heitzman then told Mr. Palmer that Mrs. Palmer had told him that he, Mr. Palmer, had a "mental illness."  Mr. Palmer calmly acknowledged that he had been diagnosed with some "genetic disorders" but that he had no intent to commit suicide.

72.     For unknown reasons, the defendants decided to transport Mr. Palmer to West Valley Medical Center ("West Valley") to be placed on a mental hold.  Mr. Palmer remained in handcuffs in the back of the patrol vehicle during the transport.

**COMPLAINT AND DEMAND FOR JURY TRIAL - 9**

73.     As Mr. Palmer was being transported away to West Valley, the Palmer's neighbors arrived at the scene.  Mrs. Palmer informed Detective Heitzman (who remained at the scene), in Officer Matthews presence, that she did not view Mr. Palmer as a threat to them or himself.

74.     At no point did any of the officers on scene take the time to investigate Mr. or Mrs. Palmer's repeated and truthful statements that Mr. Palmer was not on the bridge to commit suicide but was merely waiting for his wife to bring him gas.

75.     At no point during the entire ordeal was Mr. Palmer informed that he was free to leave and/or return to his vehicle.

76.     Mr. Palmer was cited with two violations:

   a.   Disorderly conduct under Caldwell Code § 08-01-27; and

   b.   Obstructing an officer under Idaho Code § 18-705.

77.     However, no charges were brought by the prosecutor.

78.     When Mr. Palmer was checked into West Valley by Officer Carranza, Mr. Palmer was calm and showed no signs of self-threat or grave danger to others.

79.     According to medical records, medical personnel could not see a reason for placing Mr. Palmer on a mental hold as:

> "He did not appear to be a harm to himself or others.  Additionally, the patient is cooperative and pleasant in the emergency department."

80.     The medical personnel at West Valley even contacted the Canyon County Prosecutor's office and requested that the Defendants immediately release Mr. Palmer from the mental hold.

81.     The Canyon County Prosecutor's office refused to release Mr. Palmer until a "Designated Evaluator" (D.E.) met with Mr. Palmer.

82.     In the meantime, a West Valley physician met with Mr. and Mrs. Palmer together and emphatically stated that Mr. Palmer should not be on a mental hold.

83.     Mrs. Palmer also met with a state D.E. a few days later who stated that Mr. Palmer should not have been placed on a mental hold and that Mr. Palmer's confinement had "everything to do with the police and their fears."

84.     Due to the processes required to release a patient from a mental hold, Mr. Palmer remained in the West Valley psych ward for over 50 hours.

85.     During this period, as per protocol of persons on a mental hold, Mr. Palmer was deprived of religious undergarments, which in accordance with his deeply held spiritual beliefs provide comfort and protection during times of crisis.  This was a cause of great anxiety and humiliation for Mr. Palmer.

86.     In the middle of the night, West Valley attempted to feed Mr. Palmer various medications against his permission.  This was a source of anxiety and humiliation, in that Mr. Palmer has a strong belief in natural remedies and to avoid synthetic chemical compound medications unless absolutely necessary.

87.     Mr. Palmer also slept on a hard mattress surrounded by mentally ill individuals who frequently and loudly blurted nonsensical and frightening exclamations.  As such, Mr. Palmer was unable to sleep, was frightened, and humiliated to be considered a person in the same state of mind as such individuals.

88.     While in the psych ward, Mr. Palmer's three kids and his wife were terrified and deeply disturbed by Mr. Palmer's absence and what might be occurring to him.  Mr. Palmer was painfully aware of these concerns, adding to his severe emotional distress.

89.     Mr. Palmer developed hypothyroidism while at West Valley—a potentially long-term illness—as a result of the stress of being confined in a psych ward.

90.     Mr. Palmer is deeply concerned that due to his arrest, his reputation is ruined; thereby, destroying his chiropractor business.

91.     Mr. Palmer is also concerned that friends and neighbors will learn of his arrest and mental hold and will deem him to be of danger.

92.     Mr. Palmer has experienced severe anxiety since this event.

93.     The resultant anxiety and stress of being brutally accosted, arrested and summarily put into a mental hospital for 50 hours for merely stretching on the side of the road while waiting for gas, has caused, and will continue to cause, Mr. Palmer enormous grief.

**COUNT I**
**Violation of Civil Rights: 42 U.S.C § 1983**
**(General Allegation)**

94.     Plaintiffs hereby reallege the allegations set forth in the above paragraphs as if fully set forth herein.

95.     The Civil Rights Act, codified as 42 U.S.C. § 1983, provides as follows:

Every person who under color of any statute, ordinance, regulation, custom or usage, of any state or territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or any other person within the jurisdiction thereof the deprivation of any laws, privileges or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

96.     The above-named Defendants jointly and severally violated Plaintiffs' constitution rights pursuant to the First and Fourth Amendments, as adopted through the Fourteenth Amendment, to the United States Constitution. The Defendants' arrest and subsequent placement of Mr. Palmer on a mental hold deprived the Plaintiffs of: (1) the right to verbally oppose, challenge, or criticize a police officers' actions without

retaliation; (2) the right to not be unlawfully detained; (3) the right to not be unlawfully

arrested; and (4) the right to be free from excessive force by persons acting under color of

law.

97.     The Defendants violated the Plaintiffs' constitutional rights while acting

under the color of state law.

98.     As a direct and proximate result of the violations of Plaintiffs'

constitutional rights, Plaintiffs suffered general and special damages as alleged in the

Complaint and is entitled to compensatory relief under 42 U.S.C. § 1983.

99.     The conduct of the Defendants was willful, malicious, oppressive or

reckless, and was of such a nature that punitive damages should be imposed in an amount

commensurate with the wrongful acts alleged herein.

**COUNT II**
**First Amendment Retaliation against Mr. Palmer**
**(Citation Under Caldwell Code § 08-01-21)**

100.    Plaintiffs hereby reallege the allegations set forth in the above paragraphs as if fully

set forth herein.

101.    It is clearly established precedent that a police officer must not retaliate against an

individual for expressing their First Amendment right to verbally oppose, challenge, or criticize a

police officer's actions.

102.    The Defendants cited Mr. Palmer for disorderly conduct under Caldwell Code §

08-01-27.

103.    The relevant Caldwell Code § 08-01-21 states that a person is guilty of a

misdemeanor for disorderly conduct if the person:

B.      Engages in fighting or threatening, or in violent behavior; or

C.   Uses language, an utterance, or gesture, or engages in a display or act that is obscene, physically threatening or menacing, or done in a manner that is likely to inflict injury or incite an immediate breach of the peace.

104.   The Defendants lacked probable cause to arrest Mr. Palmer under Caldwell Code § 08-01-21 because none of Mr. Palmer's acts were violent, threatening, or menacing:

a.   Mr. Palmer complied when Detective Heitzman ordered him to sit;

b.   Mr. Palmer stretching on the sidewalk is not a threat;

c.   Mr. Palmer complied when Detective Heitzman ordered him to remove his hand from his vest pocket;

d.   Mr. Palmer was not a threat when he got off the curb to meet his wife who had the gas canister;

e.   Mr. Palmer complied with Officer Carranza's order to sit prior to being handcuffed; and

f.   Mr. Palmer complied with the order to place his hands behind his back once he was accosted by the Defendants.

105.   Moreover, none of Mr. and Mrs. Palmer's comments were violent, threatening, or menacing:

a.   Mr. Palmer's comment that he was frustrated with Detective Heitzman's orders and that he has had bad experiences with police officers is protected criticism of police misconduct;

b.   Mr. Palmer's, "It's a free country still, it's still a free country, right?" rhetorical question is protected criticism of police misconduct;

**COMPLAINT AND DEMAND FOR JURY TRIAL - 14**

    c.  Mr. Palmer's insinuation that the police were harassing him and were there to write him a ticket to pay for their salaries is protected speech in opposition to what Mr. Palmer believed to be unlawful conduct by Detective Heitzman;

    d.  Mrs. Palmer's statement that the officers on the scene had an "ego problem" is protected criticism of police misconduct; and

    e.  Mrs. Palmer's statement that the officers on the scene were "obviously bored" is protected speech challenging, opposing, and criticizing police misconduct.

106.    Nonetheless, even if the Defendants had probable cause to arrest Mr. Palmer for disorderly conduct, had Mr. and Mrs. Palmer not directed their comments towards police misconduct, Mr. Palmer would not have been arrested for a minor crime that officers typically use discretion to enforce.

107.    Caldwell Code § 08-01-21 is also vague and overbroad.

108.    A substantial or motivating factor behind Mr. Palmer's arrest was to retaliate against Mr. Palmer and Mrs. Palmer's protected speech as demonstrated by:

    a.  Detective Heitzman's comment to Officer Carranza that Mr. Palmer was being "super irate;"

    b.  Detective Heitzman's comment to Officer White that Mr. Palmer is "getting irate and starting to scream at me and shit;"

    c.  Officer White's order to Mr. Palmer to "stop talking;"

    d.  Detective Heitzman's comments to Mrs. Palmer that the reason they had handcuffed Mr. Palmer was because Mr. Palmer was

arguing with them and not complying, even though Mr. Palmer

complied with every order except for his initial refusal to put his

hands behind his back; and

e.    Detective Heitzman's comment on scene that Mrs. Palmer is a

"fucking dumb bitch" for merely questioning Detective

Heitzman's motive for handcuffing Mr. Palmer.

109.    "But for" Mr. and Mrs. Palmer's protected speech against what they

perceived to be police misconduct, Mr. Palmer would not have been arrested.

110.    As a direct and proximate result of the violation of Mr. Palmer's

constitutional right, Mr. Palmer suffered general and special damages as alleged in the

Complaint and is entitled to compensatory relief under 42 U.S.C. § 1983.

111.    The conduct of the Defendants was willful, malicious, oppressive or

reckless, and was of such a nature that punitive damages should be imposed in an amount

commensurate with the wrongful acts alleged herein.

**COUNT III**
**First Amendment Retaliation Against Mr. Palmer**
**(Citation Under Idaho Code § 18-705)**

112.    Plaintiffs hereby realleges the allegations set forth in the above paragraphs as if

fully set forth herein.

113.    It is clearly established precedent that a police officer must not retaliate against an

individual for expressing their First Amendment right to verbally oppose, challenge, or criticize a

police officer's actions.

114.    Defendants' citation against Mr. Palmer for obstruction under Idaho Code

§ 18-705 was in retaliation against Mr. Palmer and Mrs. Palmer's use of protected speech.

**COMPLAINT AND DEMAND FOR JURY TRIAL - 16**

115.    Idaho Code § 18-705 states:

Every person who willfully resists, delays or obstructs any public officer, in the discharge, or attempt to discharge, of any duty of his office . . . is punishable by a fine not exceeding one thousand dollars ($1,000), and imprisonment in the county jail not exceeding one (1) year.

116.    There are three elements that must be met for an individual to be guilty of a crime under Idaho Code § 18-705:

(1) the person who was resisted, delayed or obstructed was a law enforcement officer; (2) the defendant knew that the person was an officer; and (3) the defendant also knew at the time of the resistance that the officer was attempting to perform some official act or duty.

*State v. Bishop*, 146 Idaho 804, 203 P.3d 1203 (2009) (quoting *State v. Adams*, 138 Idaho 624, 629, 67 P.3d 103, 108 (Ct. App. 2003).

117.    A person may passively resist a police officer's unlawful conduct. *State v. Wilkerson*, 114 Idaho 174, 180, 755 P.2d 471, 477 (Ct. App. 1988).

118.    The Defendants lacked probable cause to arrest Mr. Palmer under Idaho Code § 18-705.

119.    Mr. Palmer's initial refusal to place his hands behind his back was passive resistance to the Defendants' unlawful arrest.

120.    However, once Officer Carranza jumped on Mr. Palmer's back and began jamming his knee and forearm into Mr. Palmer's back and neck, Mr. Palmer placed his hands behind his back.

121.    At no point did Mr. Palmer use any physical force against the Defendants.

122.    Nonetheless, had Mr. and Mrs. Palmer not directed their comments towards police misconduct, Mr. Palmer would not have been arrested for the minor crime of obstruction that officers typically have discretion to enforce.

**COMPLAINT AND DEMAND FOR JURY TRIAL - 17**

123.    Idaho Code § 18-705 is also vague and overbroad.

124.    The substantial motive behind the citation under Idaho Code § 18-705 was borne out of malice due to Mr. and Mrs. Palmer's protected speech against police misconduct.

125.    "But for" Mr. and Mrs. Palmer's protected speech against what they perceived to be police misconduct, Mr. Palmer would not have been cited for obstruction.

126.    Therefore, the Defendants have violated Mr. Palmer and Mrs. Palmer's First Amendment right when the Defendants improperly retaliated against Mr. Palmer due to his and Mrs. Palmer's protected speech against police misconduct.

127.    As a direct and proximate result of the violation of Mr. Palmer's constitutional rights, Mr. Palmer suffered general and special damages as alleged in the Complaint and is entitled to compensatory relief under 42 U.S.C. § 1983.

128.    The conduct of the Defendants was willful, malicious, oppressive or reckless, and was of such a nature that punitive damages should be imposed in an amount commensurate with the wrongful acts alleged herein.

## COUNT IV
## First Amendment Retaliation Against Mrs. Palmer

129.    Plaintiffs hereby reallege the allegations set forth in the above paragraphs as if fully set forth herein.

130.    It is clearly established precedent that a police officer must not retaliate against an individual for expressing their First Amendment right to verbally oppose, challenge, or criticize a police officer's actions.

131.    Defendants retaliated against Mrs. Palmer's right to protest against police misconduct when the Defendants arrested Mr. Palmer and placed Mr. Palmer on a mental hold.

**COMPLAINT AND DEMAND FOR JURY TRIAL - 18**

132.    The Defendants lacked probable cause to arrest and place Mr. Palmer on a mental hold.

133.    The substantial motive behind the arrest of Mr. Palmer was borne out of malice due Mrs. Palmer's protected speech against police misconduct.

134.    As a direct and proximate result of the violations of Mrs. Palmer's constitutional rights, Mrs. Palmer suffered general and special damages as alleged in the Complaint and is entitled to compensatory relief under 42 U.S.C. § 1983.

135.    The conduct of the Defendants was willful, malicious, oppressive or reckless, and was of such a nature that punitive damages should be imposed in an amount commensurate with the wrongful acts alleged herein.

**COUNT V**
**Fourth Amendment Unlawful Detainment Under the Mental Hold Statute**

136.    Plaintiffs hereby reallege the allegations set forth in the above paragraphs as if fully set forth herein.

137.    It is clearly established precedent that under the Fourth Amendment a police officer must have probable cause to place a person on a mental hold.

138.    Under Idaho Code § 66-326(1)—in an emergency situation—a person may be involuntarily placed on a mental hold by a police officer if the police officer has "reason to believe that the person is gravely disabled due to mental illness or the person's continued liberty poses an imminent danger to that person or others, as evidenced by a threat of substantial physical harm."

139.    In this case, the Defendants lacked probable cause to believe that Mr. Palmer was gravely disabled or posed a threat to himself or other:

      a.    Prior to Detective Heitzman's arrival, Mr. Palmer was calm and collected as demonstrated by his voicemail to his neighbor.

b.  Mr. Palmer complied with Detective Heitzman's orders to sit and not put his hands in his pockets.

c.  While Mr. Palmer expressed some frustration at being ordered to not take certain actions even though Mr. Palmer had done nothing wrong, Mr. Palmer was calm during his interaction with Detective Heitzman.

d.  Mr. Palmer remained calm and collected when he spoke with Mrs. Palmer on the phone in Detective Heitzman's presence.

e.  Mr. Palmer remained calm when Officer Carranza and Officer White arrived on scene.

f.  Mr. Palmer's statement to Detective Heitzman and Officer Carranza that he was not trying to commit suicide but was waiting on his wife to deliver him gas was confirmed when Mr. Palmer pointed to Mrs. Palmer and her father who was carrying the gas canister.

g.  Mr. Palmer complied with Officer Carranza's order to sit when Mr. Palmer got off the curb to meet Mrs. Palmer coming up the bridge with the gas canister.

h.  Mrs. Palmer confirmed to all the Defendants and particularly Detective Heitzman that Mr. Palmer simply "ran out of gas."

i.  Detective Heitzman acknowledged that Mr. Palmer's statement that he had simply ran out of gas and was not attempting to

commit suicide was true when he told Mrs. Palmer to "go fill up the gas can."

j.   Mr. Palmer was calm and collected when he spoke with Detective Heitzman in the back of Officer Carranza's police car while he was handcuffed.

k.   Mrs. Palmer told Detective Heitzman, in Officer Matthews presence, that she did not view Mr. Palmer as a threat to herself or himself.

l.   The West Valley medical staff all agreed that Mr. Palmer was not gravely ill or an imminent threat.

140.   Notwithstanding all this evidence, the Defendants still placed Mr. Palmer in a mental hold.

141.   No reasonable officer would have believed that Mr. Palmer was gravely ill or presented a threat to himself; thus, justifying an emergency confinement to a psych ward.

142.   Defendants' actions were instead motivated out of animus towards Mr. and Mrs. Palmer for expressing their First Amendment right against police misconduct and/or discrimination against Mr. Palmer due to being diagnosed with a mental illness.

143.   Therefore, the Defendants lacked probable cause to place Mr. Palmer on a mental hold.

144.   As a direct and proximate result of the violation of Mr. Palmer's constitutional right, Mr. Palmer suffered general and special damages as alleged in the Complaint and is entitled to compensatory relief under 42 U.S.C. § 1983.

145.    The conduct of the Defendants was willful, malicious, oppressive or reckless, and was of such a nature that punitive damages should be imposed in an amount commensurate with the wrongful acts alleged herein.

## COUNT VI
### Fourth Amendment Unlawful Arrest

146.    Plaintiffs hereby reallege the allegations set forth in the above paragraphs as if fully set forth herein.

147.    It is clearly established precedent under the Fourth Amendment that an officer may not arrest an individual unless the officer has probable cause that the individual committed a crime.

148.    There are multiple instances where Mr. Palmer was arrested, each without probable cause:

    a.   Mr. Palmer was under arrest when Detective Heitzman order Mr. Palmer to sit and not run away.

    b.   Mr. Palmer was under arrest when Detective Heitzman ordered Mr. Palmer to sit after Mr. Palmer demonstrated the type of leg stretch, he was doing on the concrete barrier. After Detective Heitzman ordered Mr. Palmer to sit for the second time, Detective Heitzman stood over Mr. Palmer for the remainder of his interaction with Mr. Palmer. Detective Heitzman also ordered Mr. Palmer not to place his hand in his pocket.

    c.   Mr. Palmer was under arrest when Officer Carranza and Officer White surrounded Mr. Palmer.

**COMPLAINT AND DEMAND FOR JURY TRIAL - 22**

    d.   Mr. Palmer was under arrest when Officer Carranza stood in Mr. Palmer's path and placed his hand on Mr. Palmer's chest as Mr. Palmer tried to get the gas canister from his wife.

    e.   Mr. Palmer was under arrest when Officer Carranza order Mr. Palmer to sit.

    f.   Mr. Palmer was under arrest when Officer Carranza, Officer White, and Detective Heitzman handcuffed Mr. Palmer.

    g.   Mr. Palmer was under arrest when he was handcuffed in Officer Carranza's car.

    h.   Mr. Palmer was under arrest when the Defendants decided to place Mr. Palmer on a mental hold.

149.   As has been demonstrated above, at no point did the Defendants have probable cause. Moreover, when Mrs. Palmer and her father arrived with the gas canister and verified all of Mr. Palmer's statements, the Defendants certainly did not have probable cause.

150.   A reasonable police officer would not believe that he or she had probable cause to arrest Mr. Palmer.

151.   The Defendants' actions were clearly motivated out of animus towards Mr. and Mrs. Palmer for expressing their First Amendment right against police misconduct and/or discrimination against Mr. Palmer due to being diagnosed with a mental illness.

152.   Therefore, the Defendants committed an unlawful arrest under the Fourth Amendment.

**COMPLAINT AND DEMAND FOR JURY TRIAL - 23**

153.    As a direct and proximate result of the violation of Mr. Palmer's constitutional right, Mr. Palmer suffered general and special damages as alleged in the Complaint and is entitled to compensatory relief under 42 U.S.C. § 1983.

154.    The conduct of the Defendants was willful, malicious, oppressive or reckless, and was of such a nature that punitive damages should be imposed in an amount commensurate with the wrongful acts alleged herein.

**COUNT VII:**
**Fourth Amendment Excessive Use of Force**

155.    Plaintiffs hereby reallege the allegations set forth in the above paragraphs as if fully set forth herein.

156.    It is clearly established precedent under the Fourth Amendment that a police officer must not use excessive force against an individual.

157.    Officer Carranza used excessive force against Mr. Palmer when he kneed Mr. Palmer in the back, jammed his forearm into Mr. Palmer's neck, and fastened the handcuffs so tightly around Mr. Palmer's wrist that the handcuffs cut into Mr. Palmer's wrist causing Mr. Palmer pain.

158.    Officer Carranza had a limited interest in using such force against Mr. Palmer:

   a.   Mr. Palmer had not committed any crime.

   b.   Mr. Palmer was not making any threats against the Defendants and was calm prior to being accosted by the Defendants.

   c.   Mr. Palmer clearly did not have a weapon on his persons.

   d.   Mr. Palmer complied when ordered by Officer Carranza to sit.

   e.   Mr. Palmer's initial aversion to placing his hands behind his back was mere passive resistance.

**COMPLAINT AND DEMAND FOR JURY TRIAL - 24**

159.    When balancing the force used against Mr. Palmer against the totality of the circumstances, Officer Carranza's use of force was excessive.

160.    A reasonable officer would know that the force used against Mr. Palmer was excessive.

161.    Therefore, Officer Carranza used excessive force against Mr. Palmer in violation of the Fourth Amendment.

162.    As a direct and proximate result of the violation of Mr. Palmer's constitutional right, Mr. Palmer suffered general and special damages as alleged in the Complaint and is entitled to compensatory relief under 42 U.S.C. § 1983.

163.    The conduct of the Defendants was willful, malicious, oppressive or reckless, and was of such a nature that punitive damages should be imposed in an amount commensurate with the wrongful acts alleged herein.

## ATTORNEYS' FEES AND COSTS

164.    Plaintiffs have had to employ the legal services of Olsen Taggart PLLC.  Pursuant to 42 USC § 1988 and any other applicable statute or rule, Plaintiffs are entitled to an award of their attorneys' fees and costs for prevailing in the case.

## PRAYER FOR RELIEF

Plaintiffs pray for relief as follows:

1.  An award of monetary damages for Defendants' wrongful conduct in an amount no less than $500,000 for actual damages and $500,000 for punitive damages.

2.  An award of their attorneys' fees and costs.

**COMPLAINT AND DEMAND FOR JURY TRIAL - 25**

3. Any other legal or equitable relief as determined appropriate by the Court.

PLAINTIFFS DEMAND A JURY TRIAL FOR ALL ISSUES TRIABLE BY A JURY

DATED:         March 4, 2022.

OLSEN TAGGART PLLC

/s/ Nathan M. Olsen
Nathan M. Olsen
Attorney for Plaintiffs